IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**LAURA BELINDA SIMON**                                                                 **PLAINTIFF**

**VERSUS**                                         **CIVIL ACTION NO. 1:13cv16-HSO-RHW**

**MICHAEL J. ASTRUE, Commissioner**
**of Social Security**                                                                  **DEFENDANT**

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Laura Belinda Simon filed this action January 23, 2013, seeking judicial review of the denial of her claim for Social Security disability benefits. Before the Court are [7] Simon's May 23, 2013 memorandum seeking reversal of the decision of the Commissioner of Social Security (Commissioner), and [8] the Commissioner's memorandum in opposition. Simon filed no reply and the matter is ripe for ruling by the Court.

On July 20, 2010, Simon filed a Title II application for a period of disability and disability insurance benefits, alleging she had been disabled since December 24, 2009, at age 46. The claim was denied initially on August 30, 2010 [6, pp. 86-89], and upon reconsideration on October 25, 2010. [6, pp. 91-93] Simon requested a hearing on November 9, 2010. [6, pp. 8, 94-95] Simon was represented by counsel at the September 22, 2011 hearing before Administrative Law Judge (ALJ) Laurie H. Porciello, at which Simon and her husband testified. Vocational expert Katrina S. Virden was also present at the hearing, but because of additional medical evidence needed,[1] the ALJ did not have Virden testify. [6, pp. 26-83]

At the time of the hearing, Simon was just short of 48 years old. She is married and has a 28-year old son living in Louisiana. She has a high school education, but no other education or

---

[1]The MRI and EEG studies performed after Simon's 2009 seizure were not included in the medical records.

1

training, and her work history includes jobs as a tool coordinator and expeditor for Lockheed Martin in New Orleans from 1983 until she was laid off in 1988. After "a couple of years" of not working, she next worked as a sales associate, floor associate and ultimately area and department manager at Dillards department store in North Shore Mall in Slidell, LA, in the '90s. She left that job for one at Burlington Coat Factory in the same mall, where she was area manager for a year and a half until she was laid off January 7, 2009. [6, pp. 33-35] Simon received unemployment benefits until June 2009, and testified she tried to get jobs around town, but was unable to because of her seizures or because employers were not hiring at the time. She stated she had problems during her employment with Burlington and throughout 2009 with seizures and depression, and she began having panic attacks being around people. She claims she had trouble walking and concentrating.

    Simon testified that on December 24, 2009 she had a grand mal seizure at home and collapsed, and that she was taken by ambulance to Slidell Memorial Hospital where she remained hospitalized a few days[2] under care of Dr. Frank Guidry and neurologist Dr. Michael Fischer. She stated she had previously had two such seizures, one in 1987 and another in February 2006. After the 1987 seizure, she "came back to" after a few hours; she was taken to Crosby or Highland Hospital following the 2006 seizure. Simon stated that in addition to the three grand mal seizures, she has partial seizures that can "last all day... It's just a matter of [her] stress level or anxiety..." Simon testified her smaller seizures have gotten worse "in the last 18 months." [6, pp. 36-40] She describes these seizures as a loss of focus, which occurs without warning and lasts a matter of minutes or seconds, and testified she has an average of 12-24 such

---

[2]Hospital records show she was discharged the next day. [6, p. 195]

2

seizures per day. These seizures are precipitated by stress and exertion, "anything traumatizing to [her]." [6, pp. 40-41]

Simon claims she fell and broke her leg while working in the yard with her mother-in-law in April 2011. She testified, "I guess I was having the partial seizures out in the sun and I fell and broke my leg. I lost my footing and just fell a perfect way and broke it." She was in a cast for three months. [6, p. 42] Until her husband retired, he would sometimes take her to stay at his mother's house while he worked.

Simon testified she takes Keppra 5 milligram seizure medicine, the antidepressant Celexa and Xanax for nerves.[3] She stated the Keppra does not prevent the small seizures, but "softens" them a little, and she has no side effects from the drug; that the Celexa antidepressant works and Dr. Guidry had recently doubled her dose from 20-40 milligrams. Simon states she was diagnosed with depression after her brother was killed in a 1991 auto accident, and she started taking nerve medication then. She was gainfully employed and worked after that, but has since had other family deaths including her father-in-law, her father and her mother. She sometimes cries every day if she is alone. She testified she was raising her grandchild after Hurricane Katrina, and the child's mother and her husband came to Simon's house and beat her with a shotgun, and took the child from her in 2005.[4] She had a concussion and bruising about the head and was treated at the hospital in Picayune. Simon testified she also has panic attacks, and does not want to be around people. [6, pp. 44-48]

Simon testified she has a driver's license, though she does not drive other than to church 2-3 miles from her home; her husband and mother-in-law drive her where she needs to go.

---

[3] She takes Xanax every night and one during the day if she needs one, Celexa each morning, and Keppra twice daily. [6, p. 56]
[4] Simon testified she cared for her eight-month old grandson for four months before his mother took him. [6, p. 51]

3

Church is her only community activity.  She puts puzzles together, though it takes her longer to finish than it once did; she does not read as a hobby.  She testified she handles none of the family finances.  Around the house she vacuums – it recently took her two days to finish vacuuming the living room.  She testified she no longer cooks or cleans; on an average day she does nothing. [6, pp. 44-50]  Physically she has no problems.  Because of partial seizures, she does not walk very long and has fallen down steps before.  [6, p. 51]

In August 2010, Simon completed a report stating that with her medication she no longer had partial seizures, and she indicated she had modified her lifestyle to avoid crowds of people and situations which she feels precipitate seizures.  She enjoys her Sunday School class which has 12-16 members ("It's like a big family.")  She and one of the ladies from the class visit in each other's homes.  Simon also testified she and her husband sometimes eat out every night.  [6, pp. 53-55]

Simon stated she began going to Mental Health in August 2011 because Dr. Jackson (a "general" neurologist) said she had panic disorders and needed therapy and she had felt better when she was seeing Dr. Caroline Blythe.[5]  Before going to Dr. Jackson in 2011, Simon had seen Dr. Michael Fischer once about six weeks after the Christmas Eve ER visit for the 2009 seizure.[6]  Other than that, she had seen only Dr. Guidry, her "main medical doctor," the one who prescribed her Keppra.  Simon admitted the reason she went to Dr. Jackson was because her attorney suggested it.  She testified she went to him once and had no follow-up appointment to see him again.  [6, pp. 56-69]

---

[5]The records show Simon saw Dr. Carolyn Blythe from June 21, 2004 until January 30, 2007, for depression and grief counseling following the deaths of family members.

[6]The ALJ noted that medical records show that in January 2010, Dr. Fischer changed her Xanax in conjunction with seizure medications.  [6, p. 58]

4

Dr. Jackson's record of the August 10, 2011 visit with Simon indicated she was there for a neurological assessment of disability related to seizure disorder, anxiety disorder, fracture of the right leg/ankle, and severe hypothyroidism "currently adequately corrected on medications..." Simon indicated to Dr. Jackson that she was under treatment with Dr. Carolyn Blythe for "an anxiety/depressive disorder with possible components of agoraphobia."[7]  She also told Dr. Jackson her current work activity consisted of yard work and house work.  [6, p. 345] On neurological examination, Dr. Jackson found Simon to have significant anxiety and mild depression with some features of a panic disorder and possible agoraphobia.  [6, p. 346] Simon's Gulf Coast Mental Health Clinic Records indicate that on August 18, 2011 she was sad, depressed, bereaved and had grief issues over the deaths of her brother in 1990, her father in 2004, and her mother in 2007.  Similar notations are made of her visits on September 6, 2011 (depression, crying about the funeral of a friend yesterday) and October 5, 2011(crying spells, withdrawn).  [6, pp. 356-360]

Joseph C. Simon, Plaintiff's husband of 24 years, testified he had to take early retirement the month before the hearing due to his employer's going out of business.  During the years his wife worked, she was also primarily responsible for household duties, but that changed after the December 2009 seizure.  Mr. Simon testified that after that incident, Mrs. Simon had come around and was sitting up by the time nearby paramedics arrived, but she was unaware what was going on.  She was taken to Slidell Memorial, where, according to Mr. Simon, they remained for three days.  He testified he tries to distract Mrs. Simon when he perceives she is going to have a little seizure, and stated her visits to a clinic in Picayune help.  In the month since he retired, Mr.

---

[7]Dr. Blythe's records state she last saw Simon January 30, 2007.  [6, p. 236]

Simon testified he has seen his wife has eye-fluttering or head jerks that make him think she is having, or about to have, a seizure, and this happens four to five times a day. When he sees it, he yells at her to distract her or re-focus her attention on other things. He had not noted any seizure activity until the Christmas Eve incident. [6, pp. 69-71]

Slidell Memorial Hospital (SMH) records of the December 24, 2009 incident show Mrs. Simon arrived at the emergency room at 9:22 p.m. and was discharged on Keppra the next day. Her records show that for several days she had been taking Nyquil for congestion before she fell out in her kitchen. By history, she had a previous seizure at her sister's "5 years ago." She was on Synthyroid and Xanax at the time of presentation. A CT brain scan on December 24, 2009 was negative, and Dr. Fischer indicated Simon needed better control of her hypothyroidism.[8] [6, pp. 196-7, 208] The physician's impression was seizure, hypothyroidism and depression. Simon was discharged on Keppra "per neuro recommendation," to follow up with Dr. Guidry in three weeks. [6, pp. 194-95] Simon gave Dr. Fischer a history of a seizure "a couple of years ago" for which she was prescribed no medication; the Christmas Eve episode was reportedly the second such event. Dr. Fischer's impression was, "new-onset seizure, with the second seizure in a couple of years," and recommended that Simon be put on medication. He discharged her with instruction to return for an EEG and MRI as an outpatient.[9] Simon had an MRI of the brain on December 30, 2009 which revealed no abnormality. Dr. Fischer found a February 9, 2010 EEG to be abnormal with the presence of intermittent sharp waves, but no ongoing seizure activity. [6, pp. 363-64]

---

[8] A September 15, 2009 thyroid scan was abnormal, showing decreased thyroid function. [6, p. 210]

[9] The EEG and MRI were not among the medical records before the ALJ at the time of the hearing; she felt these records were essential before eliciting any testimony from the vocational expert.

Dr. Carolyn Blythe first saw Simon June 21, 2004 for depression following her father's June 10, 2004 death.  In a letter dated June 28, 2005, Dr. Blythe stated Simon was on antidepressants, that she was stable and very capable of caring for children.  [6, p. 218] Adjustment disorder was Dr. Blythe's diagnosis in June 2004; in her initial psychiatric assessment, Dr. Blythe noted no seizure disorder.  [6, p. 233]  During the course of Simon's treatment with Dr. Blythe, Simon indicated she felt better after being prescribed Lexapro. [6, pp. 222, 226]  Dr. Blythe last saw Simon January 30, 2007, almost three years before Simon's alleged onset of disability on December 24, 2009.  [6, pp.  216-235]

A psychiatric assessment by Janise Hinson, Ph.D., dated August 24, 2010 found Simon had a medically determinable impairment of anxiety disorder, but that it was not severe.  [6, pp. 236-241]  The assessment further found the disorder caused no functional degree of limitation or restriction as to activities of daily living or maintaining concentration, persistence or pace, and no episodes of decompensation.  The assessment found a mild degree of limitation in maintaining social functioning.  [6, p. 246]  The consultant's notes indicate that Simon was able to take care of daily needs, pay bills, watch television, put puzzles together, work on her car when needed, go shopping and out to eat every Friday with her mother-in-law, mow grass, do yard work, cook, clean house, do laundry and do repairs.  [6, p. 248]  Simon listed these same activities in a function report she filled out in August 2010.  [6, pp. 162-169]

A physical residual functional capacity assessment by medical consultant Dr. Robert Culpepper on August 27, 2010 indicated no exertional limitations; no postural limitations other than climbing ramps/stairs only occasionally and never climbing ladders/ropes/scaffolds; no

7

manipulative, visual or communicative limitations; and the only environmental limitation being that she avoid even moderate exposure to hazards such as machinery, heights, etc. [6, pp. 251-254] Dr. Culpepper noted that Simon's first seizure was in 2005 and the last one in 2009; that according to Simon, her seizures are currently controlled with medications; and that her December 2009 brain scan was negative and all other systems are normal as of a recent exam. [6, p. 257]

Dr. Guidry first treated Simon in January 1995 for an upper respiratory infection and muscle spasm. He has continued to treat her over the years for similar and other complaints, routine examinations, tests and immunizations, thyroid problems (hypothyroidism and goiter), bronchitis, sinusitus, nicotine dependence, anxiety, depression, difficulty dealing with stress and medication refills. [6, pp. 258-344, 349-355] He prescribed Xanax for her in 2000, and she has been on it since that time. He also referred her for psychological evaluation and treatment, and noted her reports that Xanax and other drugs helped her – on January 24, 2011 she reported she was feeling much better with the Xanax and an occasional Ativan. After that date, Dr. Guidry notes only entries for medication refills, the last entry being for a Xanax refill on July 14, 2011. [6, p. 354]

On November 16, 2011, the ALJ issued her ten-page decision on the case. Applying the five-step evaluation process for determining disability, Judge Porciello found that:

> (1) Simon had not engaged in substantial gainful activity since December 24, 2009, the alleged date of onset of disability;
>
> (2) Simon has a severe impairment of seizure disorder; although she may also have hypothyroidism, depression and/or anxiety, and mild obesity, the latter individually or in combination, "constitute only a slight abnormality having

      such a minimal effect on [Simon] that it would not be expected to interfere with her ability to work," thus they are not severe.

(3) Simon did not have an impairment or combination of impairments that met or medically equaled the severity of relevant listed impairments; and

(4) Based on the record as a whole, Simon had the residual functional capacity to perform a full range of work at all exertional levels with restrictions to avoid unprotected heights, moving machinery and other hazards in the workplace.

In making her findings, the ALJ placed great weight on the psychiatric review prepared by Janise Hinson, Ph.D., which noted the many activities in which Simon engaged, and the lack of significant limitations on her activities, and concluded Simon's mental impairments are not severe under the Act.  This finding is amply supported by record evidence, including statements made by Simon herself that was able to take care of her own daily needs, pay bills, watch television, put puzzles together, work on her car when needed, go shopping and out to eat every Friday with her mother-in-law, mow grass, do yard work, cook, clean house, do laundry, do repairs and go out for dinner with her husband as often as every night.  [6, pp. 162-169]

      The ALJ also carefully evaluated Simon's testimony and found it not wholly credible.  While her medically determinable impairments might be reasonably expected to cause some of her alleged symptoms, Simon's statements about the "intensity, persistence and limiting effect of the symptoms are not credible insofar as they are inconsistent with the residual functional capacity assessment."  Her December 2009 MRI revealed no brain abnormality and her February 9, 2010 EEG showed no ongoing seizure activity.  In August 2010 Simon completed a report stating that with her medication she no longer had partial seizures, and she told Dr. Jackson in August 2011 that she had not followed up with any specialist for seizures since July 2010.  Based on the whole of the evidence, the ALJ found no more than mild limitations on Simon's

9

activities due to her mental disorders, no exertional limitations other than to never climb ladders/ropes/scaffolds and only occasionally climb ramps and stairs, and to avoid hazards.  The ALJ concluded Simon is capable of performing work within her residual functional capacity; her limitations do not prevent her from performing work at all exertional levels, thus she is not disabled as defined by the Act.  [6, pp. 14-21]  The Appeals Council denied Simon's request for review on November 20, 2012, prompting the filing of this action for judicial review.

Standard of Review

Judicial review of a final decision of the Commissioner is limited to determining whether substantial record evidence supports the Commissioner's factual findings, and whether such findings are reached through the application of correct legal standards.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  The Court reviews the entire record to determine whether substantial evidence supports the Commissioner's decision.  *Villa*, 895 F. 2d at 1022.  Credibility of witnesses and conflicts in the evidence are issues for resolution by the Commissioner, not the Court, and "an ALJ's assessment of a claimant's credibility is accorded great deference."  *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).  It is not the Court's prerogative to substitute its judgment for that of the Commissioner or to re-weigh the evidence.  *Harris v. Apfel*, 209 F.3d at 417(quoting *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995));  *Johnson v. Bowen*, 864 F.2d

340, 343-44 (5th Cir. 1988)(a finding of "no substantial evidence" is appropriate only if no credible evidentiary choices or medical findings support the decision); *Selders v. Sullivan*, 914 F. 2d 614, 617 (5th Cir. 1990).  Factual findings supported by substantial record evidence are conclusive and must be upheld.  *Estate of Morris v. Shalala*, 207 F. 3d 744, 745 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).  The Court may reverse a decision of the Commissioner if it is based upon faulty legal analysis, but should accept the Commissioner's legal conclusions if they are within reasonable meanings of the statutory or regulatory language.  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 841-44 (1984).  Absent a finding that the decision is unsupported by substantial evidence or that the Commissioner applied an incorrect legal standard, the Court must affirm the Commissioner's decision.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## Analysis

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months..." 42 U.S.C. § 423(d)(1)(A).  As the ALJ noted in this case, determination of a disability claim involves a five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(4)(i-v).  This process requires findings as to (1) whether the claimant is engaging in substantial gainful activity, (2) whether she has a medically determinable impairment that is severe, *i.e.*, which significantly limits the ability to perform basic work activities; (3) whether the impairment is of sufficient severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 – if it does, the claimant is disabled, if not the analysis continues.  At Step (4), the ALJ must determine claimant's residual functional

capacity, *i.e.*, her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments, and then determine whether claimant has the residual functional capacity to perform the requirements of her past relevant work (work performed within the 15 years preceding the onset of disability). If she can do so, she is not disabled, if not the analysis proceeds to the final step (5) where the ALJ must determine whether she can do any other work considering her residual functional capacity, age, education and work experience. If she can, she is not disabled; if she cannot do other work and meets the duration requirement, she is disabled.

As previously stated, the ALJ found Simon was not engaging in gainful employment, that she had a medically determinable severe impairment of seizure disorder, and other non-severe conditions, but that her conditions, individually or collectively, neither met nor medically equaled a listed impairment. Relying on substantial record evidence, the ALJ determined Simon's residual functional capacity and the limitations which her impairments placed on her ability to do physical and mental work activities on a sustained basis, and found Simon could not perform the requirements of her past relevant work as a store manager, which is deemed sedentary but skilled, with a specific vocational preparation level of seven. [6, pp. 14-20] However, using the Medical Vocational Guidelines as a framework for her decision, the ALJ found Simon's non-exertional limitations "have little or no effect on the occupational base of unskilled work at all exertional levels," and that she was therefore not disabled. [6, pp. 20-21] Simon's complaint in this case is that the ALJ decided Step 5 without testimony from a vocational expert.

Vocational expert testimony is not the exclusive source of substantial evidence that a claimant can perform available, alternative employment. The Commissioner can take

administrative notice of availability of alternative work by consulting predetermined findings contained in the Medical-Vocational Guidelines to determine whether an individual is able to engage in substantial gainful activity. *Heckler v. Campbell*, 461 U.S. 458, 461 (1983). The Medical-Vocational Guidelines were promulgated to improve uniformity and efficiency in the determination of Social Security claims. As the *Heckler* Court stated, the guidelines "relieve the Secretary (Commissioner) of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy." *Id*. Considering Simon's age, education and work experience along with her residual functional capacity, and in light of the lack of significant exertional limitations, Simon's restrictions (to avoid unprotected heights, moving machinery and other hazards), and Simon's own statements in the record as to the various activities in which she engages,[10] the ALJ properly utilized the framework of the Medical-Vocational Guidelines to find that Simon's limitations "have little or no effect on the occupational base of unskilled work at all exertional levels," which makes a finding of "not disabled" appropriate under that framework. *See Tamez v. Sullivan*, 888 F.3d 334, 335 (holding substantial evidence supported ALJ's finding claimant capable of light work where claimant's ordinary physical activity – driving, picking up around the house, sweeping, yard work, occasional car repairs, and doing dishes– was consistent with ability to perform light work). "A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." Social Security Ruling (SSR) 85-15, 1985 WL 56857. Where, as here, the impairment is not of listing severity, but prevents the claimant from performing past relevant work, the ALJ must determine whether

---

[10]In August 2010, Simon's activities included yard work, mowing, cooking, cleaning house, laundry, repairs, working on her car, regularly going shopping and eating out. Barely a month before the administrative hearing she described her work activity as yard work and house work. [6, pp. 162-169, 345]

she can be expected to perform unskilled work. The undersigned is of the opinion that the factual findings of the ALJ which show Simon remains capable of performing such work are amply supported by the record. As stated in SSR 85-15 (1985):

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.
>
> ***
>
> Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work.

## RECOMMENDATION

Having considered the entire record of the proceedings below and controlling law, the undersigned is of the opinion that the Commissioner's final decision is supported by substantial evidence and in accord with relevant legal standards. Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Rule 72(a)(3), *Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi* (Dec.1, 2011), after service of a copy of this Report and Recommendation, each party has fourteen days to serve and file with the Clerk any written objections to it. Within seven days of service of objections, the opposing party must either serve and file a response or notify the District Judge that he does not intend to respond to the objection. An objecting party must specifically identify the findings, conclusions, and recommendations to which she objects; the District Court need not consider

frivolous, conclusive, or general objections. A party who fails to file written objections to the proposed findings, conclusions, and recommendations within fourteen (14) days of being served a copy is be barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal conclusion accepted by the District Court to which he did not object. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Signed, this the 5th day of February, 2014.

/s/ *Robert H. Walker*
ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE